This is 4-13-0818, People's State of Illinois v. Russell Miller. Here on behalf of the appellant is Attorney Heyman, and on behalf of the appellee, Attorney Brooks. Mr. Heyman, are you ready to proceed? I am ready. Okay, you may do so. Good morning, may it please the Court. Good morning, Counsel. Once again, my name is Sam Heyman. I represent the appellant, Russell Miller, on behalf of the State Appellate Defender. Russell Miller was convicted of a methamphetamine-related drug offense and eventually sentenced to 19 years in prison, based almost entirely on evidence seized as a result of two illegal searches. Because both those searches violated the Fourth Amendment, this Court should suppress the evidence seized therefrom and reverse Russell's conviction. The first illegal search occurred when Lt. Bell of the Quincy Fire Department responded to what he described as a small amount of smoke venting from the chimney of the garage that Russell Miller rented in Quincy. The State claims that Lt. Bell's entry of that garage was justified by the emergency aid doctrine. However, that doctrine requires specific circumstances that would justify a reasonable person in the belief that a serious emergency requiring immediate aid existed. And that language is almost verbatim from Brigham City v. Stewart, which is the 2006 U.S. Supreme Court case. In this case, Lt. Bell testified to no such specific and articulable facts that would justify a reasonable person in the belief of an emergency. Instead, his testimony establishes that he wanted to investigate what he believed was an ordinance violation because of what he described as the trash odor of the smoke. The facts as which Lt. Bell described him were these. He received a 911 call and was dispatched to an area in Quincy. When he arrived at that location that he was dispatched to, he found no fire evident in the area. So he called off the other two responding fire trucks. He began to widen his search for the source of possible smoke. He was directed to an area about a block south by some people on the street. He eventually found a small amount of smoke from the chimney of that garage. Instead of immediately forcing entry, he walked around the garage. He noticed nothing else was amiss. There was not smoke emanating from the windows or the door or the roof. The walls weren't blackened as he described. He didn't even touch the walls to see if they were warm. Instead, he walked around and he went to the residence that was associated with the garage and asked if any of the residents had a key because he wanted to minimize the damage to the door. At no point in his testimony at the suppression hearing did he say that he believed an emergency existed. Rather, he repeatedly said that he wanted to investigate what he described as the trash odor of the smoke, which would have, according to him, constituted an ordinance violation. He also, we know, said he didn't expect to find a body inside the garage, and we know he was on the scene for at least five minutes before he forced entry. These are not the specific circumstances that would justify a reasonable person's belief that an emergency existed. So what should have he done? Just leave? He should have. Every minute he's on the scene, Your Honor, I believe any possible emergency is dissipating, right? Every second he's there. So he could have seen if the scene was deteriorating in any way, and there's no evidence in the record that it was. There's no evidence that it was anything but stable. And then, yes, by his own testimony, the remedy for an ordinance violation was just to post that notice of violation, which is just basically telling someone to knock it off. And if Russell had continued to do it later, he could have been fined, or maybe eventually the state could have forced entry. But, yes, he should have just remained on the scene and seen what was happening, obviously. There was no emergency, we know in hindsight, but the longer he was there, the more he knew that it was an emergency, and I think eventually he realized that anyway by his own admission. If you contrast the facts known to Bell with the recent U.S. Supreme Court decisions that have construed the emergency aid doctrine, in Brigham City v. Stewart, the court described the scene that officers confronted as a melee. They arrived to this backyard at 3 in the morning. They immediately saw two juveniles drinking beer in the backyard. They looked through the kitchen window of the residence and saw four adults restraining another juvenile, and as they watched, they saw that juvenile break free, punch one of the adults in the face, saw that adult spit blood into the sink, saw that juvenile re-restrained with such force that he was pushed up against a refrigerator that began to move across the kitchen floor, and the Supreme Court said, under those circumstances, those are specific circumstances that would justify a belief that immediate entry was required without a warrant to aid the person who had already been injured and to prevent further injury to others who may be threatened. Michigan v. Fisher is a more recent case, very similar extreme circumstances where officers were justified in their belief in an emergency. And then if you compare those cases with the two appellate court cases that I discussed in the briefs, Fedor and Plant. In Fedor, the witness who saw a fairly serious hit-and-run accident that heavily damaged the defendant's car followed the defendant home. The defendant's car was so heavily damaged that he had to lean out the window in order to drive home. Eventually, the police responded to the defendant's home, but the officer in charge acknowledged at the suppression hearing that he didn't know whether the defendant was injured or not, although we know from the record of that suppression hearing that they repeatedly knocked on the door to no response, they heard the dog barking inside, but because the officer in that case said he was speculating, basically he didn't know, he didn't have specific circumstances that would justify his belief that the person was injured, the defendant, that the officer's entry in that case was not justified by the emergency aid doctrine and the court reversed the trial court's finding and suppressed or reversed his conviction for DUI. And then I'd also just direct your attention to PPP Plant, which is the other Illinois appellate court case where the state on appeal, well they argued two theories on appeal, one was that it was a consent search, which is not an issue in this case, but was rejected, and then alternatively they argued that a meth lab is an imminently dangerous condition, and the officer in that case said he suspected a meth lab, but the court found it important in that case, most important in that case, that rather than immediately force entry if he believed that the meth lab was so dangerous, and securing the premises and calling the authorities to dismantle the lab, instead of doing that, he had a five to ten minute conversation with the defendant, and only then did he enter and arrest the defendant and find the meth lab, and the court said, well based on the fact that he waited that long, every moment he was there, the emergency was dissipating, clearly there was no emergency, they don't call it emergency, they call it exigency, but it seems clear that they were applying. Counsel, when the fireman entered the building, as I understand the facts, he then proceeded to the stove, and he opened the stove, is that correct, and then he saw the burning blister pack, one, correct? Correct, his testimony was one, and the officer said two, but then conceded that Lieutenant Bell might have been right, that it was one. From my reading of the briefs, the fireman did not see any other evidence of meth use, other than the blister pack, is that correct? That is correct, at least Lieutenant Bell did not testify that he saw anything besides that. Okay. After, well go ahead your honor. Well, to me these facts are pretty important as far as the timeline, that's why I'm asking you this, is it my understanding then after the officer took the wood and the trash and the blister pack out of the stove, the fireman, did I say officer, the fireman then left the scene, is that right? He remained on the scene to, he placed the wood in the alley, but he wasn't involved in searching certainly. Okay, well really what I'm getting at, is it correct that the police then arrived after the fire personnel had already departed? I don't think that's correct, Lieutenant Bell testified that police were dispatched to every fire call, and there were police on the scene when he responded, or almost contemporaneously with when he responded, and that when he, he had some training in meth fires, when he saw the blister pack, he notified the police that were on the scene. I believe that's correct, if the state can correct me. The state's brief on page four says after firefighters had already left the scene, Martin, who was a police officer, entered the garage because other police officers told him that the fire department found several burnt blister packs. Is that a correct statement of the facts? I believe so, I believe Martin might not have been the one who was initially notified, it was another officer, then the other, the officers that were notified by Bell told Martin. And then Martin went in the building? Yes, and saw the snort tube, then said, well okay, we need a warrant now. Well if the firefighters had already left the scene, that they had abated the nuisance, if indeed there ever was one, why would the police officer then enter the building? That police officer didn't have a warrant, did he? Well, you're exactly right, you're exactly right, he should not have. That's our position at least. But again, I mean, my understanding of the facts is that, in fairness to the state, is that the police were on the scene when Lieutenant Bell was on the scene. Lieutenant Bell sees the blister pack, tells the police, I think we may have a meth situation, but then, yes, you're absolutely right, without a warrant, the police go in, look at the blister pack, sees the snort tube in plain view, what he described as a snort tube in plain view, and then says to another officer, you just wait here, we'll go get a warrant. I hope that answers your question, Your Honor. Well it does, just from reading the briefs, in fact, from the state's brief, it sounds like the officer entered to gather sufficient evidence so he could go get a warrant. Because I don't think one blister pack would justify a probable cause for a search warrant. Do you agree with that? I agree with it, yes, I absolutely agree with that. Well, I'll address my questions to the state when they have their own. Okay, thank you, Your Honor. Okay, well that segues into the, so the first search we contended was the initial entry, which was not justified by an emergency. It was speculation, and Lieutenant Bell testified, you know, it could have been anything, which by that phrasing indicates that he was speculating, and his actions indicate that he didn't think it was very likely that there was some sort of blaze going on. But the second illegal search occurred when, as Justice Turner, as you pointed out, when Lieutenant Bell opened the door, saw the properly functioning wood stove, which was operating exactly as intended, but instead of leaving Russell Miller's private property at that point, continued to enter further, walked over to the stove, opened the door, and then dug in and found some wood, some paper, and the single blister pack. And the state doesn't dispute, in the briefs at least, that once Lieutenant Bell saw the wood stove, the properly functioning wood stove, that any emergency, any threat of emergency was dispelled. Instead, the state shifts and said there was a new justification for the search, which was effectively nuisance abatement, which, as I indicated in the briefs, it's debatable whether that even exists as an exception to the warrant requirement of the Fourth Amendment. But if it did, it would not apply in this case. And the state locates the nuisance abatement exception to the Fourth Amendment in the community caretaking exception, which is a legitimate exception to the warrant requirement, although it's debatable, again, whether it applies to searches other than automobile searches. But in our state, we apply a two-prong analysis to community caretaking searches, and neither one is met here, which is fatal to the state's position. The first prong is that the purpose of the search must be totally divorced from the detection or investigation of crime. In this case, Lieutenant Bell repeatedly said he was investigating what he believed to be an ordinance violation, which is subject to the warrant requirement. It's a quasi-criminal statute, punishable by the state. So he was investigating a crime by his own admission. So that prong is not satisfied. The other prong is that the purpose must be to render aid to people in danger or prevent danger to people around the situation. Here, as the state concedes, the smoke was contained in the wood stove by Lieutenant Bell's own description. Nothing else was amiss. It wasn't leaking. So that prong is not satisfied either. So again, even if a nuisance abatement exception does exist in some extreme circumstances, this would not satisfy them. And if you look at the main case upon which the state relies, which is that Sixth Circuit case, Rory, which is where at 1.30 in the morning there was music blaring from a house that you could hear a block away, and there was a cadre of pajama-clad neighbors demanding that the police enter, and the door was already open to the house. The court later heavily limited that, the holding in Rory, and said it was extremely fact-specific, but that in that case it was an immediate, ongoing, and highly objectionable nuisance. In this case, Lieutenant Bell's vague testimony about a trash odor, and he was the only witness to testify to this odor, and we know the 911 call was not about an odor. It was about heavy smoke or a house fire, and the judge specifically found that it was not related to Russell Miller's garage later in the proceedings. Right, I mean the fire department was dispatched to a different address. Exactly. Exactly, Your Honor. So even if the exception, the nuisance abatement exception exists, it would not apply in this case because there was not sort of this extreme nuisance that would justify a warrantless entry. And again, by Lieutenant Bell's own testimony, he didn't comply with the protocol for dealing with nuisances in the Quincy City Code and in his own training. He was supposed to post a notice of violation for this minor nuisance if it was indeed a nuisance, and only if Russell repeatedly offended would he have been fined. And the Quincy City Code says, you know, property owners are supposed to be informed of the problem, given seven days to abate the nuisance, and only then can the state intrude on their private property. So in this case, Lieutenant Bell searched Russell's private property for a possible nuisance without a warrant. That violates the Fourth Amendment, and the evidence seized as a result of that search should be suppressed. Both searches violate the Fourth Amendment, and this Court should reverse. And I just want to briefly turn to the sentencing issue. The state graciously pointed out that Russell is incorrectly serving 75% time when he should be getting day-for-day credit, because there was no showing that he made more than 100 grams of meth in the garage. If you have any questions about the state's concession, I'm happy to answer them, but it's supported by the plain language of the statute and the legislative history of the statute. But if there's no questions, I just rest on the brief. And I'd also rest on the brief regarding the excessive sentence issue, which hopefully is moved. Hopefully both of these are moved if Your Honor's reversed the conviction, but I rest on the brief. All right, so because – Go ahead, Counselor. Thank you, Your Honor. You can finish up. Well, just for the reasons mentioned and the reason given the brief, because the searches here violate the Fourth Amendment of the U.S. Constitution, we ask that you reverse Russell's conviction. Thank you. Thank you, Counselor. You'll have additional time on rebuttal. Okay, thank you. All right, Ms. Brooks. Good morning, Your Honor. May it please the Court and Counsel, I'm Allison Paige Brooks, appearing on behalf of the people. First of all, the Emergency Aid Doctrine is cited in the state's brief with respect to justification for the entry into the garage because of the authority showing that community caretaking doctrine is doubtful, is a justification for – a justification to enter into a structure such as a home. So, therefore, the Emergency Aid Doctrine, however, does extend to entries within structures such as this garage. Let me ask you a question. Here, the fire department is dispatched to an address that is different from the address of this garage. If I could respond to that question. My understanding is that the report was smoke in the area of 7th to 8th and Jackson, and the garage was in the alley behind 726 Jackson, which appears to be in the same area. They did show up on one street and then had to go over to another street, and they talked to somebody who sort of directed them in an area. But the report was of heavy smoke, and by the time they arrived, they didn't actually see heavy smoke. They saw what the firefighter described as a smaller amount of smoke. And what they saw was smoke coming out of a chimney. Right, but there's no evidence specifically saying what was in the report other than it was a house fire, but the person who called the report might not have been at the actual address but merely seen smoke rising from what could have been someone's house and made the assumption that that is what they were calling for an emergency fire. Right. What I'm getting at, though, is this is a garage, not a house. And number two is that the smoke is coming out of the chimney where smoke should be coming from. Exactly. And essentially, I understand the defendant's point is that if this court were to affirm, the defendant's point is that this court would be somehow authorizing firefighters to make a forced entry to any unattended house with smoke coming from a chimney. That's not the case here. There's specific facts that motivated this firefighter to act as he did, and that is that this happened in May on a warm day, and more importantly, the smoke had an odor of trash to it. So it was not ordinary wood-burning chimney smoke, but in the officer's experience, and this court should defer to the firefighter's experience in fighting fires in terms of what the firefighter believed was something that indicated, at least in his mind, a possibility of an actual structured fire that needed to be investigated. Well, he testified there was no smoke coming out of the windows, no smoke coming out under the door. He testified the smoke was light, it was coming from the chimney. How would the fact that it smelled like trash give him the right to enter that locked garage? Because, at least in his mind, he considered the fact that the trash smell could be caused by an actual structured fire inside the structure. I don't think he testified to that, though, did he? I don't think he said that. He didn't say that there was a possibility of actual structured fire or that he... He did not testify in my recollection, and I could be wrong. I don't believe he testified that the odor of trash burning indicated to him this could be a structural fire. That's all right. Go ahead with your record. I understand. According to my brief, the statement of facts is he expressed concern smoke, stacked smoke could be, quote, smoldering fire inside the building, record 202. He says he wasn't sure what's creating the smoke. It was a smoldering fire ready to backdraft, ready to flash over, and he explained what those meant. And those were serious things. It could blow out the windows. It could spread the fire. Okay, so let me ask you this. Once he opens the garage door, he forces the garage door open, and he sees that there's a wood stove in there that's properly connected to a chimney. There's no smoke flying. What gives him the right to open the door to the stove? Well, because, as the state's argued, the state did cite community caretaking below. It's not forfeited. As the state exactly can argue this. And even if it's not community caretaking, per se, in the automobile context, there are cases such as the Lanthier case, California 1971, which was cited by the Roarick Sixth Circuit case. Lanthier was the case in which there was a smell coming from a student's locker. And in an administrative search context, that was opened without a warrant. And that was upheld as being reasonable under the Fourth Amendment, despite the fact that they didn't have a warrant to open the locker. It's a closed container. In that case, the student had a privacy interest in the contents of that. I mean, here, it's a different privacy interest. So it's a stove attached to a chimney, and you would be burning things in that stove. That's what it was there for. That's the function of that stove. Except it's not intended in the city of Quincy to be used to burn trash. And the firefighter detected the smell of trash. Alright, so how is that a community caretaking function, for him to go in and open the door to the stove? Because he did receive a complaint in the form of a 911 call. He responded to that area. He detected this. He smelled trash odor. And citizens of Quincy have decided that that's not something they want to have in their town. And so it is... But the 911 call didn't involve the smell of burning trash. It wasn't an odor-type call. It was a fire. Right. It was not an odor-related specific call.  So if somebody's burning trash in their home, in a wood-burning stove, and it goes up the chimney, and it smells like trash, are you taking the position that the police or the firefighters have the right to break into somebody's home to determine whether, in fact, they're burning trash in an enclosed stove? No, Your Honor. And that's why this case is distinct. Because there is a firefighter who reasonably opines that there is a threat of an actual structured fire which poses an emergency threat to property. That is his justification for going inside. If he does not have that justification for going inside, then he would be in a situation like what the defendant suggests, is simply try to ascertain who is the owner and post a notice of violation. And what I'm getting at, let's assume, for the sake of argument today, that he had justification to break open this locked garage door. What gave him further justification to open a closed wooden stove that is functioning apparently properly? Because he testifies there's no smoke being emitted other than through the smoke stack up the chimney. Right. The nuisance abatement, even in the Respondent's reply brief, cites the Quincy Municipal Code section 22.104. That section does authorize the official to make a summary abatement of a nuisance wherever the owner-occupant is unknown and cannot readily be found. Wait a minute. Wait a minute. For the community caretaking function, there are two criteria you have to meet, right? No. I'm sorry, Your Honor. How many are there? The defendant's analysis discerns two prongs, so to speak, from McDonough. But that's not actually the sort of, like, the need to prevent danger is not an actual prong. What about under Ludeman? I'm sorry, Ludeman? The government actor has to be performing some function other than the investigation of a crime. The state accepts that as prong one, yes. Okay. What you said is the firefighter goes in. He thinks there's an ordinance violation because of burning trash. And then he proceeds to open a closed wood stove that's functioning properly to determine, under your theory that you're telling me, is sufficient for a community caretaking function because of an ordinance violation. He's investigating a crime at that point, according to you. Actually, he's abating the nuisance. I think it was the defense that elicited the fact that burning trash would be the ordinance violation. But the municipal code did authorize him to abate the nuisance because the owner could not be found. And that was authorized as a summary abatement. He didn't have to post notice and give seven days. But the second prong is with the state disputes. This claims second prong that there has to be a need to prevent some sort of danger to the public in order to perform community caretaking. Because the McDonough case itself lists among several of these community caretaking police functions the mediation of noise disputes. Certainly not something that involves a threat to public safety that the police are allowed to engage in as a community caretaking function. So if that's the case, there's no real need to prevent danger as being an element of community caretaking. Although, in fact, there was a public safety threat that was identified in McDonough in that particular case. But that doesn't mean that that's a required element in every single case of community caretaking. I think what they did is the defense is sort of like grafting on an extra requirement based on particular facts of McDonough and saying that that's a required element for every case when it's not actually the case. Also, the defense is not allowed to cite remarks made at sentencing as a way of challenging the trial court's pre-trial ruling on the motion to suppress evidence. So the sentencing remarks by the judge, which in the state's opinion erroneously finds some sort of disconnect between the 911 call and the smoke that was found at this address, that should not be relied on as a way of deciding whether the trial court was correct to deny the pre-trial motion to suppress. The state does distinguish federal implants. Those cases had no inference of an emergency here. There was an inference of emergency, and that was a reasonable inference of emergency because the firefighter had specific and articulable facts in the form of the nature of the smoke, with the trash odor and the fact that that trash burning is not allowed in the city, and the time of year meant that there should not have been something burning from that chimney at that time of year, particularly with that kind of smoke coming out. It was something that a reasonably prudent firefighter would and should investigate with the utmost urgency, and the fact that the firefighter, whose purpose here was to minimize property damage, decided to check for a minute with nearby occupants of the associated residence, this was the detached garage in the alley, to see if their key could be obtained in order to prevent the door from having to be forced, which would actually compound the damage. So that is a reasonable thing to do, consistent with the urgency of the situation, and in fact, courts cautioned, reviewing courts, reviewing courts are cautioned against engaging in sort of like, sort of hindsighted, second guessing of officers in quickly developing situations. It did take a couple minutes for him to find the garage, and it did take him a little bit of time, maybe perhaps a couple minutes, to force the door open with the halogen bar. So the five minutes are fully accounted for. There's no standing around like in this plant case of talking for ten minutes about what possibly to do about something, and in plants there specifically was no, there was just simply an assumption made that if there's a meth lab, it's somehow dangerous. There's not any actual smoke that suggests, at least to an experienced firefighter, that there's a possibility of a structure fire that needs to be dealt with immediately. Didn't he call off a second fire truck to tell him to go back? Yes, but he did not leave himself. I mean, if he left and didn't worry about it for a while, that would be inconsistent with emergency. The fact that additional units were called away does not necessarily mean that the officer himself, or the firefighter, did not believe there was an actual threat of emergency sufficient to force the door. He did call off backup units, that is correct. But that doesn't mean... Wouldn't that tend to show he believed there was no structural fire? It meant that he, it would probably mean that he did not think that there was a risk to the surrounding neighborhood at that point that required the response of additional units from across town. But when he does get to the scene, he still believes there is the likelihood of a structural fire inside that needs to be investigated, at least by his unit. I understand Justice Turner had questions earlier I'd like to address. Even if the firefighters were justified in going in the building, even if they were justified in opening the door to the stove, what justification did the officer, subsequent to the firefighters leaving, have to go into that building without a warrant? Well, in this case, the defendant's theory was not premised on a challenge to the conduct of the police themselves, but the entry by the firefighter. And the states have, and the parties have not briefed the question, and so therefore the state has not had an opportunity to develop what sort of... Isn't our review de novo on the ultimate question of whether a motion to suppress should or should not be granted? Except if this court were to decide the case on a theory not raised or argued by the parties, it would be depriving the state of an opportunity to brief and argue questions, such as exceptions to the report warrant requirement. The opportunity for the state to have developed a record below to show the exact timing of the entry of the various persons. I think it was Brian Martin was actually... Yeah, counsel, I did cite your brief in the statement on page four. After firefighters had already left the scene, Martin entered the garage because other police officers told him that the fire department found several burnt blister packs. So, and you heard me ask the opposing counsel, it sounds like to me the officer went in to see if he could find other evidence which would give him probable cause to obtain a search warrant. And if so, that's a problem for the state. Do you agree with that, I presume? If there was... If there had been a subsequent search of the same location after firefighters left, I agree that could be a problem, that that should have been raised by the defense, and then the case could have been tried and litigated on that basis. And I understand that one thing the statement has pointed out is the state's statement of facts also includes the reference in the trial testimony which refers to Officer Craig Russell, who's a trainee police officer. And that's why he talks to Officer Martin, who arrives in response, or it's because he's part of the supervision, perhaps, of Officer Russell, who's the trainee officer. And then it's Officer Martin's decision to then go seek the warrant. So if Russell gets inside, which I'm not sure if that's clear in the record, while the firefighters are still inside the place, then it seems like that's Officer Martin's subsequent entry after Officer Russell's already obtained the probable cause to go get a warrant. The state needs an opportunity to have litigated the questions of whether that somehow created a Fourth Amendment violation that could be defended on the basis of some exception to warrant requirements, such as, I forgot, if there's an ongoing investigation that might somehow not require the warrant to require suppression. As I said, it still has an opportunity to address the case on that ground. Well, was it Officer Martin who saw the other methamphetamine precursors, the lithium, and I think it was the blow tube and whatever else, wasn't he the one that saw that, and isn't it true that the firefighter only saw the blister pad? As far as I know, the record does not show the firefighters having seen or engaged in any investigation other than the stove itself. What they could have seen from plain view, for example, was not elicited. Right. Some of the items were in plain view. I understand your point that apparently, and I'll ask in rebuttal if you're correct, that the state wasn't actually put on notice that perhaps, regardless of what the firefighters did, what the officer did, the peace officer did, was a violation of the Fourth Amendment. That's what you're saying. You didn't really have a chance to develop facts, cite cases that may be applicable. I don't understand the cases having been litigated on the theory that independent of the firefighters' conduct, that the officers violated the Fourth Amendment without some sort of justification or exception. I will ask counsel about that, but based upon the facts as I understand it, that really appears to me to be a hurdle that I'm not sure the state can overcome. Having developed a record, that's unknown at this point. But we can't change the facts, though. The facts are the facts. I understand that. Regardless of what the legal argument is. I understand that, Your Honor. With respect to the final issue I'd like to mention is the Camra case, which is a U.S. Supreme Court, a distinguished routine inspections in which there's no need for a set time or day, with more urgent emergency-type situations where there's no need to get a warrant. And here there was a complaint, and Camra mentions that a citizen complaint or other satisfactory reason for securing immediate entry. Here there was a citizen complaint. And I think Camra recognizes that that's a satisfactory reason for securing an immediate entry to a location, and therefore that means that there's no need for the firefighter to have left the scene and to obtain an administrative warrant while the smoke smoldered inside the wood stove. So the state does want to emphasize, however, affirming this case will not authorize firefighters and police to just simply barge in any house that has a burning chimney. So this court could very carefully draft the opinion to make that clear. This is not a rubber stamp for all sorts of invasions of privacy. So for those reasons, the state requests this court to affirm it. Thank you, Your Honors. Thank you, Counsel. Let's see. Mr. Heyman, rebuttal. Thank you. The first thing I'd like to address is this. Well, go ahead. No. Okay. The first thing I'd like to address is this idea that the summary abatement procedures in the Quincy City Code somehow authorized Lieutenant Bell to, without a warrant, dig into Russell's stove and put an end to the smoke. To the extent that is true, and again, I think this would be a non-emergency situation and he should have followed the protocol by posting a notice of violation, et cetera. To the extent that that's true, though, the Quincy City Code can't authorize something that violates the Fourth Amendment. And the Fourth Amendment does not contain a nuisance abatement exception, except possibly in extreme cases, which this does not rise to. The other thing, as far as the warm day, perhaps it's a minimal factor, suggesting that something may be amiss, but with all the other factors that we know, that there was no smoke, the walls weren't blackened, he didn't see that the walls were warm, he spent time walking around, clearly the balance of factors indicates that there was no emergency. People are allowed to have idiosyncratic habits. You're allowed to use your chimney on a warm day. The Fourth Amendment allows for that sort of privacy and security in your home, your private property. So simply having smoke coming from your chimney on a warm day would not authorize warrantless searches of your private property. And then finally, I think it's important to realize the very minimal interest in nuisance abatement that's at issue here. And if you look at Welsh v. Wisconsin, which we didn't cite, but since the state just brought this up, in Welsh, which is a 1984 U.S. Supreme Court case, the court said, an important factor to be considered when determining whether an exigency exists is the gravity of the underlying offense for which the arrest, but in this case search, is being made. In Welsh, it was a DUI, and the state claimed there was an exigency because the alcohol in the defendant's blood was dissipating all the time, they didn't have time to get a warrant. And the court said the minimal interest in preventing DUIs, which I would contend is much higher interest than in abating nuisances, was not enough to justify a warrantless entry in that case. Counsel, before we run out of time, I don't think it's a surprise to either one of you, I'm a little bit concerned about the police officer's conduct. But the state has argued they weren't really put on notice for the issue that I have a question both of you about. What's your response to that? I would agree with the state to the extent that it wasn't litigated in the lower courts, and the record may need to be developed more fully. So if your honors rejected the idea that the emergency aid doctrine applied, well, except that the emergency aid doctrine applied and except that there was a nuisance abatement exception, which I hope you don't, but if you did, I could see that perhaps remand might be appropriate. What further development of the record would be necessary in order to make a decision on whether the officer's conduct is in violation of the Fourth Amendment? That's a good question. Maybe your honor is correct. I can't be correct because I'm not taking a position on this yet. But I get the idea that the record might be able to be further developed, but I'm just trying to figure out what exactly would be any further development in the record which would assist a judge in making the Fourth Amendment issue determination. I'm aware of some cases, which I don't recall the names, where courts have held that when police officers enter a premises basically on the heels of the fire department, that what they observe in plain view is not subject to suppression. So if the fire department and the police were there at the same time and the state's brief is wrong when it says that the officer arrived after the firefighters had left, then that would be a development in the record that would be something for us to consider on the Fourth Amendment issue. Is that right? I suppose so. Okay, so we don't know from the record then whether the firefighters had left the scene when the officer entered the building and saw the lithium and the pipe and whatever else the officer was able to see in plain view. I believe the state is correct that Lieutenant Bell had left the scene before Officer Martin entered. Other police, the trainee officer at least, had entered while Lieutenant Bell had been informed directly by Lieutenant Bell. But I would analogize that to the U.S. Supreme Court fire case, I believe it was Michigan v. Tyler, where the court said just because the initial entry was authorized, it was an arson case. These repeated warrantless searches were subject to suppression because you don't get multiple freebies just because the first one was. So I assume a principle like that would apply to Officer Martin's observations. Are there no other questions? Thank you very much. Thank you, Counselor. We'll take this matter under advisement and stand in recess.